Motion to dismiss appeal denied April 22, 1930; argued October 15, affirmed November 17, 1931; argued and submitted on rehearing April 26; former opinion adhered to May 31, 1932.

## TURNER *v.* JACKSON

(4 P. (2d) 925, 11 P. (2d) 1048)

*Wilber Henderson,* of Portland, for appellant.

*J. H. Carnaham,* of Klamath Falls (W. C. Van Emon and Harold L. Cook, both of Klamath Falls, on the brief), for respondent.

CAMPBELL, J. This is an action by plaintiff to recover an alleged balance due on a contract for the construction of an apartment house in Klamath Falls, Oregon. It is alleged that plaintiff built the building under a written contract, set out in full in the complaint, in which defendant agreed to pay the cost, plus 15 per cent, of the labor and materials that he used under said contract, which amounted to the sum of $36,852.85, and that he has been paid $25,437.67, leaving a balance of $11,415.18 due, for which plaintiff demands judgment with interest from September 1, 1927.

The material parts of the alleged contract are (the contractor being the first party):

"The first party agrees to construct for the second party said apartment house according to plans and specifications as prescribed by the second party and in such manner and of such material as the second party may, from time to time prescribe, and the first party shall, with all reasonable diligence, proceed to and complete the construction of said apartment house in a good and workmanlike manner."

     *       *       *       *       *

"The first party shall protect and save harmless the second party from all liens and damages whatsoever in connection with the construction of said apartment house."

*     *     *     *     *

"It is understood that the cost of construction of said apartment house shall include any extra expense or cost which may be incurred by reason of any alterations or changes in the construction of said apartment house which the second party may cause from time to time to be made."

To this complaint the defendant filed her answer which was a general denial of all the allegations of the complaint; "except such as is hereinafter specifically admitted, otherwise stated or qualified."

For a further and separate answer and defense, defendant alleged in effect: That the written contract set out in plaintiff's complaint was not all of the contract, nor did it truly state the terms of the agreement under which the building was constructed. That under a set of plans and specifications furnished by plaintiff, he in writing agreed and guaranteed to construct said building according to said plans and specifications, at a cost to defendant not exceeding $31,000. That plaintiff began the construction of said building on March 29, 1927. That in the construction, plaintiff breached the contract in many particulars. The answer specifies and itemizes the different parts of the structure which were not built according to the plans and specification, and the amount of damage she suffered thereby, including certain parts that were not finished, totaling the sum of $21,408.91.

For a second and separate answer and defense, defendant attempted to plead fraud on the part of plaintiff in procuring her signature to the contract, and alleges a damage in the sum of $21,408.91, and

attempted to plead an estoppel by such fraud. The prayer of the answer and counterclaim asks for judgment on the first counterclaim for $21,408.91 and for the same amount on the second separate answer and counterclaim.

A copy of the letter which defendant claims was a part of the contract was attached to her answer, marked exhibit "A", and reads as follows:

"April 4, 1927.

"Dear Mrs. Jackson:

"Your request for some understanding in writing as to the cost of the building which I am to erect for you in Klamath Falls is hereby submitted.

"The building will cost you $31,000. The loan company have guaranteed me $28,000 on the plans and specifications submitted to them and say that they will increase this when the building is completed. However, I am confident that I can get a loan large enough to cover the cost of the building.

"The loan company have agreed to give me a second mortgage to cover any incidental expenses that might occur, such as furnishing, etc.

"This letter is to guarantee that you will be able to pay back the $3,000 that you were forced to borrow. Trusting this letter is as you want it, I am,

"Yours very truly,

"F. D. Turner, Builder."

There is also a copy of the specifications attached to the complaint and marked exhibit B.

To these counterclaims plaintiff filed a reply denying all the material allegations therein.

On these issues the case was tried to a jury which returned a verdict in favor of defendant for the sum of $2,500. Judgment was entered in accordance with the verdict. Plaintiff appeals.

Upon the close of the testimony, plaintiff moved for a directed verdict on the ground that there was no evidence to contradict plaintiff's claim because defendant failed to introduce any evidence of damages sustained under the contract alleged in the counterclaim. The motion was denied and plaintiff excepted.

The case was tried by plaintiff on the theory that defendant could not show by parol evidence that the letter marked exhibit "A" was signed at the same time and as a part of the contract entered into between the parties, for the reason that the letter was dated April 4, and the contract was dated April 5. The trial court agreed with plaintiff in this respect. However, determining the case on the appellant's theory upon which it was tried in the trial court, there was still enough left in defendant's answer upon which she could recover damages. There is no serious dispute that the specifications and plans introduced in evidence were the plans and specifications in accordance with which the building was to be constructed.

██ The plaintiff agreed to carry out his contract, "with reasonable diligence and in a good workmanlike manner." If he failed to do this and by reason thereof damages ensued, defendant would be entitled to recover. There was not such a divergence between the contract pleaded by defendant and the one pleaded by plaintiff, aside from the letter guaranteeing that the total cost should not exceed $31,000, as to prevent defendant's recovery. It was not error to permit defendant to introduce evidence showing wherein the plaintiff failed to comply with his contract either by poor workmanship or by negligently leaving undone what he agreed to do. The cost of supplying what was left undone would not be the measure of damages, but such evidence was admissible to show that what was

omitted was not a matter of small moment. It would tend to show that plaintiff materially failed "to proceed to and complete the construction of said apartment house in a good and workmanlike manner." It was therefore competent to show that plaintiff failed to "complete" his contract, not in minor details but to a substantial extent. Before plaintiff could recover under his contract, it was necessary for him to show that he had completed the building in accordance with the plans and specifications, and any evidence that tended to refute this was competent. With such evidence properly in the case, the court did not err in refusing to direct a verdict.

■ Appellant's counsel strongly contends that in any event, under the theory upon which the case was tried, defendant failed to introduce evidence of damages in an amount sufficient to offset the amount claimed in the complaint and of which there was some evidence tending to prove. Plaintiff is not suing on a quantum meruit, but on the completed contract. There was therefore a question for the jury to determine, whether he had completed his contract so as to justify them in allowing him the plus 15 per cent. There is nothing in the pleadings, nor in the evidence tending to show that plaintiff was in any way hindered from completing his contract. On the other hand, the pleadings of defendant allege failure to perform, and there is some testimony tending to support the allegations of the answer.

■ ■ Plaintiff saved an exception to the court's instruction:

"If there is a conflict in the evidence as to the terms of the contract made between the plaintiff and defendant, then it is the duty of the jury to determine the intention of the parties; and in arriving at the intention

of the parties, the jury have the right from the evidence to look to the circumstances under which the contract was made, the subject matter, and the objects the parties intended to accomplish."

It would perhaps have been safer to have instructed the jury that there was a conflict of testimony regarding the contract. Defendant claimed that the plans and specifications she introduced in evidence were the ones by which the contract should be covered. The plaintiff denied that allegation. It was a question for the jury to determine whether the plans and specifications, so introduced, were actually a part of the contract between the parties. It was not error to give the instructions complained of.

■ The trial court was really in error in not permitting defendant to show that defendant's exhibit "A" was a part of the contract and a contemporaneous agreement. It is immaterial that it was not signed by defendant so long as it was accepted and acted upon by her.

"An agreement may be evidenced by several different writings, which when connected, show the parties, subject matter, terms and consideration." *Spencer v. Bales,* 108 Or. 339 (216 P. 746).

When the two writings are executed contemporaneously, "covering the same subject matter, they will be construed together as constituting one agreement." *Temple v. Harrington,* 90 Or. 295 (176 P. 430); *Kinney v. Scheussel,* 116 Or. 376 (239 P. 818); *Hattrem v. Salmon River Improvement District,* 132 Or. 297 (285 P. 231).

■ The date upon which an instrument was executed may be shown by parol. In the instant case, defendant offered to show by parol that the date of the execution of defendant's exhibit "A" was different from

that stated thereon. This she had a right to do. It was not varying the terms of the instrument. Regardless of the date of signing, the execution was not complete until delivery.

"The execution of a writing is the subscribing and delivering it, with or without affixing a seal." Oregon Code 1930, § 9-705.

Taking the view we do of the pleadings and evidence, the judgment of the lower court should be affirmed, and it is so ordered.

BEAN, C. J., RAND and BROWN, JJ., concur.

---

Former opinion adhered to on rehearing May 31, 1932.

ON REHEARING
(11 P. (2d) 1048)

ROSSMAN, J. The very earnest manner in which the appellant argues that our previous decision was in error has caused us to once more read the evidence, to again consider the exhibits and to apply to the various briefs studious attention.

The plaintiff again urges that the circuit court erred when it denied his motion for a directed verdict. It will be recalled that this is an action upon the contract. The complaint, after quoting in full the contract upon which the plaintiff relies, alleges: "Pursuant to said agreement, and in compliance with the terms thereof, plaintiff, during the months of April, May, June, July and August of the year 1927, did erect or construct upon said described real property an apartment house for the defendant, and in all things and respects fully complied with all of the terms and conditions of said contract  *  *  *  and by reason of the

terms and conditions of said contract, plaintiff became and was entitled to a compensation of  *  *  * due and owing from defendant to plaintiff under said contract.'' The answer denies all allegations of the complaint which aver that the plaintiff performed his contract. We pause to take note of the well-established rule that before a plaintiff can recover upon a complaint which alleges a contract and its performance the proof must establish at least substantial performance: *Camp & DuPuy v. Lauterman,* 78 Or. 134 (152 P. 288) ; *Pippy v. Winslow,* 62 Or. 219 (125 P. 298) ; *Edmunds v. Welling,* 57 Or. 103 (110 P. 533) ; *Williston on Contracts,* § 841; 9 C. J., ''Building and Construction Contracts,'' p. 739, § 78. A contractor who in good faith endeavored to perform his contract but stopped short of actual performance by a substantial margin, and yet conferred a benefit upon the other party which the latter elected to retain, may recover for the benefits conferred upon a quasi contract liability: Woodward, The Law of Quasi Contracts, § 175. For the reason, so we assume, that this is an action upon the contract and not one of a quasi contract character, the plaintiff offered no proof whatever of the reasonable value of the materials and labor which he bestowed upon the defendant's property. Let us now consider the portions of the evidence which indicate whether the plaintiff substantially performed his contract.

█ The contract upon which the plaintiff relies provides: ''The first party (plaintiff) agrees to construct for the second party said apartment house according to plans and specifications as prescribed by the second party and in such manner and of such material as the second party may, from time to time, prescribe  *  *  * and complete the construction of said apartment house in a good and workmanlike manner.'' The defendant

produced a set of specifications which the plaintiff identified, thus: "I believe these are the specifications, yes," and added that he built the structure as directed by them "excepting the changes Mrs. Jackson made during the construction of the building." Now bearing in mind that the plaintiff bound himself to construct the apartment house in conformity with the aforementioned plans and specifications, except as the defendant directed him to depart therefrom, we find that testimony—much of it uncontroverted—indicates the following: (1) The specifications provide: "The entire building to be heated with hot water plant complete in every respect, with pumps, surplus water supply, domestic hot water, etc., complete in every respect * * *." The source of the hot water supply was a natural hot water well located upon the lot, and the above requirement of the specifications required the plaintiff to install pumps to lift the water out of the well and force it into the heating pipes. The pumps he installed failed to operate and the defendant was required to substitute others in their stead at her expense in the sum of $471.11. She was also subjected to $268.52 expense in adjusting wiring for the pumps. She incurred a further expense of $262.72 in correcting some inferior work performed by the plaintiff in the installation of the heating system. (2) Due, in part, to the fact that the plaintiff placed the concrete footings upon ground not sufficiently solid to sustain its weight the building sagged badly at places, causing large cracks in the plaster and leaks in the roof. In order to restore the bulding to its proper level and remedy the damage which had been done by the sagging, the defendant incurred an expense of $273.50. The plans show the size of the footings and the depths to which they should be sunk. The contract provided

that all work should be done "in a good and workmanlike manner." The plaintiff's foreman testified that neither the plans nor the specifications indicated the depths of the footings. Possibly his failure to familiarize himself with his employer's duties accounts for the fact that the footings failed to sustain the load placed upon them. But, be this as it may, we notice that the plaintiff testified that he had completed the excavation before the contract was signed. Hence, it may be fair to assume that when he established the levels for the footings he disregarded the plans. (3) Although the specifications required the plaintiff to use "clean river-washed sand and gravel" in making the concrete, he used "Shasta sand" and crushed rock. His foreman described the concrete, thus: "It sure looked awful." And another witness, who was a general contractor, testified that the concrete work was very poor and that it should be replaced. To rebuild it in conformity with the specifications would cost approximately $1,800. The plaintiff, in explanation of his failure to comply with the above requirement of the specifications, explained that river-washed sand and gravel was very expensive at Klamath Falls, and in a volunteered answer, stated: "I asked Mrs. Jackson if she wanted to pay the price for washed sand and gravel, which would cost maybe five times as much more money," but became diverted into another subject before stating her reply. He did not deny that the concrete work was of inferior quality and needed replacement. The defendant denied that she had authorized any such departure from the specifications. (4) Although the plans showed that the first-story girders should rest upon the concrete basement walls, the plaintiff failed to carry the concrete to the first story line. (5) The specifications defined the lumber to be used, thus:

"Girders No. 1 Common; wall plates No. 1 Common; floor joists No. 1 Common; roof joists No. 1 Common; floor, wall sheathing No. 3 shiplap; roof sheathing No. 2 Common shiplap." The plaintiff used only 900 feet of No. 1 Common in the construction of the building. All of the rest of the lumber consisted of No. 2 and No. 3 Common with some No. 4 shiplap. The floor joists are of No. 2 Common. The evidence indicates that No. 1 Common is sound lumber, free of all defects which impair its strength; No. 2 Common is material with defects such as fair-sized loose knots which impair the strength of the material. (6) The specifications required the contractor to "tint all bedrooms, closets, dining-kitchens and ceilings of dining-kitchens, baths and living rooms with two coats of tint and sizing." No sizing whatever was applied to the walls before they were kalsomined. The evidence indicates that the purpose of sizing is to provide an intervening coat between the lime plaster and the kalsomine so that the lime will not burn and thus injure the tints in the kalsomine. The witnesses described the kalsomining as "not a first-class job" and testified that approximately $100 had been saved by not sizing the walls. (7) The specifications required the basement floor to be "graded to floor drains." This was not done and as a result any water that entered the basement failed to reach the drains. To correct this defect cost $37. (8) The specifications provide: "All exterior walls to be finished with Portland Cement stucco, over which a heavy coat of Oriental stucco is to be used    *    *    * all mortar for scratch and brown coats to be mixed, one part Portland Cement by volume to three parts good, clean, sharp sand, with addition of not over 10 per cent by volume hydrated lime. The first scratch coat is to be applied at least one-half inch thick or

until all wires are covered and is to be thoroughly cross-scratched * * * the brown coat is to be applied to bring the stucco to at least three-fourths inch thick from the sheathing * * * the finished coat is to be Oriental stucco dashed on as per factory specifications * . * *." The stucco is not three-fourths inch thick but is so thin that at places the metal lath upon which the stucco was applied can be seen. Its average thickness is one-half inch. The cement that was used was not Portland Cement. Due to the fact that not enough Stone-Tone had been ordered by the subcontractor the available quantity was increased by adding 50 sacks of cement. The subcontractor who applied the stucco, testified, "If the stucco had been applied according to the original specifications, as set forth in these specifications, and would have been a good job, the building would have been worth considerably more than at the present time." He added that it would have cost approximately $2,000 to have done the stucco work in harmony with the specifications and that it would cost from $800 to $900 to apply an additional coat of stucco to bring the material to a thickness of three-fourths inch. Appellant's brief apparently assumes that the defendant authorized the plaintiff to depart from the specifications by making the changes just mentioned. We have read the transcript of evidence with care but have found nothing which demands a holding that the defendant authorized such changes. (9) The specifications provide: "All rooms, walls and ceilings are to be plastered with No. 2 standard approved plaster * * * finished coat to be sand-finished in bedrooms, closets and all ceilings * * * living room walls are to be trowel-finished for paper." The living rooms were not trowel-finished and had to be rubbed so as to remove the pro-

truding sand before they could be covered with wallpaper. A witness testified that even after walls have been thus rubbed a satisfactory job of wallpapering cannot be done. (10) The specifications required the plaintiff to furnish a "3 x 6 copper vent over each range hood." He installed galvanized iron vents. (11) The specifications required the plaintiff "to furnish all the necessary flashing for the entire building including necessary flashing around tile work." Needed flashing was omitted in some places with the result that water leaked into the building, damaging the walls, and the defendant was compelled to redecorate them and adopt other remedies. She expended $315 in this manner. (12) The specifications provided: "All interior painting to be 4-coat enamel-finish work using 2-coat flat white, one coat mixed, half flat white, half enamel. The finish coat, enamel. All enamel to be Sherwin-Williams Old Dutch enamel. All work to be rubbed down between each coat with No. 0 and No. 0000 sandpaper, so that all work is free from dust and dirt before any paint is applied." The sandpapering was omitted, only three coats of paint, instead of four, were applied, and instead of using Sherwin-Williams Old Dutch enamel, which costs about $8.50 a gallon, the plaintiff substituted another paint which cost about $3.50 a gallon. A witness testified that by eliminating the fourth coat the plaintiff saved about $300 to $350. (13) The specifications required: "The stucco contractor will be held liable for cleaning off all woodwork and glass after his work is finished, and all glass must be covered while the dash coat is being put on, as the stucco cannot be removed from the glass without scratching it." The evidence indicates that the defendant was required to expend $3.50 in removing succo from woodwork and $110 in removing it from the

windows. (14) The specifications provided that the light fixtures should be of "Spanish design." The plaintiff disregarded this requirement. (15) The specifications provided that the plaintiff should "wire each apartment for a radio, with jack." This was not done. (16) Four doors which were hung by the plaintiff were so badly cracked that the manufacturer supplied others in their stead. The defendant, however, was required to bear the expense of transporting them to Klamath Falls, of hanging and varnishing them. The varnish cost $6.75, in addition to which the defendant paid the carpenter and the painter. (17) The specifications provided: "The walls of baths and dining-kitchens to be painted the same as the woodwork up to door and window height." Only three coats were applied, the gloss was uneven and the walls showed brush marks. A witness described the workmanship thus: "It was hardly a passable job, below the average grade." Another witness estimated that $20 was saved upon each of the 12 apartments by applying only three coats of paint. (18) Some flights of concrete steps that led from the courtyard to several of the apartments left the concrete wall to which they had been attached and settled badly. The cement walk in the courtyard also settled. This was due to the fact that the plaintiff had constructed them upon newly filled ground which he had failed to tamp so as to assure a solid footing. A witness testified that these defects would be hard to overcome without completely rebuilding the steps. (19) One of the girders was smaller than the plans required and was so weak that it sagged under its load.

It will be observed that in each of the foregoing instances the plaintiff violated an item of his contract which set forth his duty in clear and unambiguous language by substituting an inferior item for the one

called for by the specifications, or by performing his undertaking in an unworkmanlike manner, at least a jury could so infer. It will also be observed that in many of the above instances, as in his failure to prepare the footings, to tamp the soil before he poured the concrete steps, to grade the basement toward the sumps so that water would drain toward them, and to cover the windows before the finished coat of stucco was applied, additional expenses were forced upon the defendant. It will also be observed that when the plaintiff substituted inferior articles for those required by the specifications, as for instance, three coats of inferior paint for the four coats of Sherwin-Williams enamel, and No. 2 joists in place of No. 1, he forced upon the defendant something which she had not requested. We have not overlooked the fact that in regard to some of these items the plaintiff offered a few words of explanation which possibly were intended to indicate that the defendant had authorized some of the deviations from the specifications. For instance, he testified that the defendant saw upon the premises cans of paint bearing the name of a manufacturer other than that of the Sherwin-Williams Company, but such meager utterances cannot demand a conclusion that the defendant had thus waived performance of the demands of the specifications.

In addition to the foregoing, the plaintiff also neglected his contract duty in the following particulars. Those to which we shall now refer inflicted no actual damage upon the defendant, unless the contract of the parties limited the cost of construction to $31,000. The specifications required the plaintiff to install in the entrance to the second floor apartments "a No. 19 'S' Couch telephone set equipped with two call buttons * * *." He failed to do so. They also re-

quired him to "install 12 wall beds as and where shown on plans." He failed to do so. These cost $682.95. They also required him to "install battleship linoleum in all dining-kitchens properly laid." After the plaintiff had failed to do so the defendant provided the linoleum at an expense of $237.50. The specifications required the plaintiff to "landscape court and grounds as shown on plans, with fountain, etc." He failed to do so. The fountain cost the plaintiff $37, and she spent $150 in landscaping the grounds. The specifications provided: "Living room walls to have tapestry paper." The plaintiff provided none. It cost $65 per room. The contract provided that the plaintiff should pay all items incurred in the construction of the building so promptly that no liens would be filed. Three of the subcontractors filed liens.

■ It will be observed that all of the foregoing breaches were of a substantial character and that some of them must have been willful. In *Pippy v. Winslow,* 62 Or. 219 (125 P. 298), this court defined the quality and the extent of partial performance which is needed to qualify it as substantial performance. We quote therefrom: "The substantial performance of a contract like the one in question permits only such omissions and deviations as are inadvertent and unintentional, are not due to bad faith, do not impair the structure as a whole, can be conveniently remedied, and may, without injustice, be paid for by deductions from the contract price." See also *Edmunds v. Welling,* 57 Or. 103 110 P. 533), and Williston on Contracts, § 841. In *Edmunds v. Welling,* supra, this court pointed out that the issue whether the contractor's partial performance was sufficient to qualify it as substantial performance is generally one for the jury's determination. It will be observed from the foregoing that the plaintiff

breached his contract in more than a score of particulars. Many of the breaches are of a very serious character, as in the substitution of inferior lumber for the kind required by the specifications, and cannot be remedied. The plaintiff offered no explanation whatever concerning some of these departures from his contract duty. The circumstances could readily have persuaded the jury that many of the breaches were willful. It must be evident from the foregoing that the circuit court did not err when it denied the plaintiff's motion for a directed verdict.

█ █ The plaintiff argues that the evidence does not support the verdict. It will be recalled that his evidence showed that $6,279.49 more was expended in the performance of his contract than he had received. However, $3,000 of the amount he expended came from a relative of the defendant, and for its return the plaintiff apparently is not liable. Hence, the aforementioned sum of $6,279.49 must be reduced to $3,279.49 in order to determine the precise amount that the plaintiff is out of pocket. Plaintiff's contract entitled him to a commission of 15 per cent upon the cost of labor and material. Thus, the judgment of the circuit court, if sustained, will cause the plaintiff to forego not only his commission and $3,279.49 but also to pay $2,500 to the defendant. The aforementioned many breaches of the contract could readily have warranted the jury to conclude that the plaintiff was not entitled to the commission, and thus we eliminate that item from further discussion.

If it was evident that all money expended by the plaintiff in the erection of this building (plaintiff had possession of the defendant's money and he himself drew all the checks that disbursed it) was applied to-

ward the construction of one conforming to the plans and specifications, the plaintiff's argument would possess more merit than it now does. But such is not the case. His argument somehow assumes that these numerous deviations from the specifications were excusable and that plaintiff's failure to produce the desired result should not be charged against him. He argues that his substitution of less expensive materials for those demanded by the specifications saved the defendant much money under the cost-plus contract. Assuming that his failure to abide by his contract can thus be condoned yet it does not appear that the plaintiff actually saved the defendant anything. The plaintiff nowhere testified that he charged the defendant with only three coats of inferior paint in lieu of the four coats demanded by the specifications. He did not admit that his subcontractor had omitted the coat of sizing and had refrained from charging for it. He offered no explanation whatever about the alleged absence of flashings nor does his testimony even mention many of the other items which we have reviewed above. Quite to the contrary, he testified that he had completed his contract and his complaint, as we have seen, after quoting the contract avers the plaintiff's performance of it. After the defendant and her witnesses had testified at great length concerning the aforementioned omission, substitutions and damages resulting therefrom, the plaintiff did not deny that he had charged the defendant with the cost of material and workmanship as defined by the specifications. It seems clear that this contention of the plaintiff is without merit and that he is not entitled to receive the sum of $6,279.49.

The problem now presents itself whether the $2,500 judgment against the plaintiff is supported by evi-

dence. This judgment presupposes that what the plaintiff produced is not worth what he received, and that his breach of the contract subjected the defendant to at least $2,500 damages.

■ Before considering the evidence we shall take note of the plaintiff's argument that the judgment for $2,500 is not supported by the defendant's pleadings. The complaint avers the contract to which we have adverted. The answer denies all allegations of the complaint "except such as is hereinafter specifically admitted, otherwise stated or qualified." Next, the answer "by way of cross complaint and counterclaim" alleges some negotiations which it avers culminated in the contract under which the apartment house was erected. These averments seem to indicate that the contract was a parol one, and that the instrument referred to in our previous decision as Exhibit A was merely a guarantee of faithful performance and an assurance that the cost of construction would not exceed $31,000. Continuing, it avers "that plaintiff furnished defendant with copies of plans and specifications for the erection of the apartment house; that a copy of said specifications is attached hereto." These specifications are the ones to which we have previously referred. This "cross complaint and counterclaim" alleges numerous breaches of the specifications and damages to the defendant ensuing therefrom. Thus, the complaint refers to specifications. The answer does the same. When a set of specifications was offered in evidence they proved to be the ones referred to by both the complaint and the answer. It was breaches of the specifications and not of the stipulations of the contract which resulted in the award to the defendant. The contract was important only because it constituted

the support or foundation for the specifications, yet the specifications were as much a part of the contract as any paragraph of the latter instrument. The two together were, in fact, the contract, with the addition, as pointed out in our previous decision, of Exhibit A. Thus, the "cross complaint and counterclaim" alleged faithfully every portion of the contract which was material to the breaches upon which she expected to rely. Defendant's confusion in regard to the immaterial portions of the contract produced a pleading lacking in the nicety which a good pleader is fond of producing, but the defects did not mislead or prejudice the plaintiff. Before the time of David Dudley Field such errors in pleadings were regarded more seriously than today. Our code (section 1-911, Oregon Code 1930) deprives such errors of their potency, thus: "The court shall, in every stage of an action, disregard any error or defect in the pleadings or procedure which shall not affect the substantial rights of the adverse party." We, therefore, conclude that the plaintiff's criticism of the answer has revealed no defect which demands a reversal, and we shall now proceed to determine whether the evidence supports the judgment.

The rule of damages generally applied to breaches of the character before us is to award to the injured party an amount of money equal to the cost of curing the defects, provided repair is the prudent remedy to apply: *Chamberlain v. Hibbard,* 26 Or. 428, (38 P. 437); *Williams v. Island City Milling Co.,* 25 Or. 573, (37 P. 49); Sedgwick on Damages (9th Ed.) § 644; Sutherland, Damages, (4th Ed.) § 699. It will be seen that much of the evidence presented by the defendant showing the specific amount of damage fits in with this rule and re-

veals $3,188.10 damages, if we do not exclude the difference in cost between the pumps. Thus, precise proof of $3,188.10 damages was supplied but the proof in regard to the balance ($2,591.39) was not specific, and required the jury to name the sum without the assistance of any witness' opinion as to amount.

■ The items of damage concerning which no witness expressed an opinion as to amount are: the substitution of inferior lumber and paint for the grades required by the specifications; failure to trowel-finish the plaster in the living rooms; failure to tamp the soil before building the concrete steps, etc. Let us consider the nature of the damage imposed by one of these substitutions. The floor joists shown by the detailed plans are 2x8 with a 15-foot span and the specifications required that they should be No. 1 Common lumber. It will be recalled that the joists installed by the plaintiff are made of No. 2 Common. Plaintiff's building superintendent testified that a 15-foot span is altogether too long for a 2x8 joist. Undoubtedly he was right, yet the responsibility for this error attaches to the architect. But the plaintiff was at fault when he substituted No. 2 Common, with its defects which weaken the strength of the material, for the quality demanded by the specifications. He thereby made a bad job worse. It seems almost as difficult to measure in dollars the damage inflicted by such a wrong as to estimate accurately the damages to be awarded for a personal injury. Whenever the amount of damages is susceptible of proof, proof must be offered. Sedgwick on Damages (9th Ed.) § 171. But there are instances where precise evidence of value being unavailable, the rule has been relaxed and the recovery has been sustained. We so held in *Gabrielson v. Dixon,* 133

Or. 567, (291 P. 494.) For a citation of other cases, see Sedgwick on Damages (9th Ed.) § 171a. In *Hartman v. Pittsburgh Incline Plane Co.,* 159 Pa. 442, (28 Atl. 145,) it appeared that an abutment built by the defendant caused water to be discharged against the walls of the plaintiff's house, thereby destroying the plaster and paper on the walls and causing his rooms to become damp and untenantable. We now quote from the decision:

"While the witnesses did not state, in dollars and cents, any amount of damages resulting to plaintiffs therefrom, they so described the nature, character and extent of the injury to the plastering, etc., that the jury could have ascertained with reasonable accuracy the amount thereof. As described by the witnesses, the actual damages were by no means inconsiderable. In Allison v. Chandler, 11 Mich. 542, it was said: 'Juries are allowed to act upon probable and inferential, as well as direct and positive, proof; and when, from the nature of the case, the amount of damages cannot be ascertained with certainty, we can see no objection to placing before the jury all the facts and circumstances of the case having a tendency to show damages and their probable amount, so as to enable them to make the most intelligible and probable estimate that the nature of the case will permit.' The ordinary intelligence and experience of jurors is sufficient to enable them to say, with reasonable accuracy, how much it would cost to repair damages such as were described by the witnesses in this case. But, if it were otherwise, the plaintiffs were entitled, under the evidence, to at least nominal damages, unless their witnesses were disbelieved. Pastorius v. Fisher, 1 Rawle, 27; Sedg. Dam. 142. In any event the case is a proper one for submission to the jury."

We believe that the same principles are applicable to the problem before us. The defendant presented all of the proof available to her showing the char-

acter and extent of damages which had been inflicted by the breaches now under consideration. The plaintiff asked for no instruction governing the recovery of damages, and does not criticize those given. Twenty-five hundred dollars or so does not seem like an excessive award for this breach. It is our opinion that this contention is without merit.

The foregoing disposes of all of the contentions argued in the brief accompanying the petition for rehearing except the one concerning the circuit court's instruction to the jury which is quoted in our previous decision. Apparently, the trial judge gave this instruction under the erroneous assumption that both the letter referred to in our previous decision as Exhibit A and the contract upon which the plaintiff relied had been received in evidence. Both documents should have been received. The plaintiff and the defendant explained at length the circumstances which caused the plaintiff to write the letter. In addition to those explanations the plaintiff recounted at length the developments which preceded the execution of the contract and the source of the specifications and plans. He seemed to believe that those explanations were somehow needed. It is our opinion that those extended explanations and a failure to recall that the letter had been excluded induced the court to give the instruction which the plaintiff now attacks. With the explanation of this instruction that is set forth in our previous decision, we remain content that this contention shows no prejudice to the plaintiff.

In fairness to the plaintiff, we add that the above references to the evidence must not be deemed an indication that we vouch for its truthfulness. The cause was tried by a jury, and hence our duty has been limited

to an investigation to determine whether the verdict is supported by substantial evidence. Possibly the defendant was faultfinding, and it may be that the verdict is liberal but, since it is supported by substantial evidence, we cannot disregard it.

It follows from the foregoing that we adhere to our previous decision.

BEAN, C. J., BROWN, RAND, CAMPBELL and KELLY, JJ., concur.

BELT, J., absent.