**STANDARD OIL COMPANY OF CALIFORNIA, Appellant,**

v.

**Clyde A. PERKINS, Appellee.**

**Nos. 18928, 19352.**

United States Court of Appeals
Ninth Circuit.

June 14, 1965.

Rehearing Denied Sept. 3, 1965.

Francis R. Kirkham, Richard J. Mac-Laury, Thomas E. Haven, Pillsbury, Madison & Sutro, San Francisco, Cal., Wayne Hilliard, James H. Clarke, Koerner, Young, McColloch & Dezendorf, Portland, Or., for appellant.

Roger Tilbury, Portland, Or., for appellee.

Before POPE, KOELSCH and DUNIWAY, Circuit Judges.

KOELSCH. Circuit Judge.

In 1953, Standard Oil Company of California entered into a consignment contract with Clyde A. Perkins, Lee G. Powell and the Harris Oil and Distributing Companies.[1] The contract permitted the consignees to sell Standard's petroleum products on a "non-exclusive basis" in designated areas of Washington and Oregon. Those areas were "outlined and indicated on the print marked Exhibit B, attached" to the contract and "made a part" thereof. Exhibit B consists of two maps, both of which clearly include the Yakima, Washington area as part of the territory in which consignees could distribute Standard products.

In 1956 a new contract was executed which "terminated and superseded" the 1953 contract. After operating under the 1956 agreement for two years, Perkins terminated his relations with his co-consignees and Standard. In 1959 he then commenced an action in the Superior Court of the State of Washington against Standard, seeking damages for breach of contract. The action was predicated on Standard's refusal to provide Perkins with products for distribution in the Yakima area.

Alleging diversity of citizenship between the parties, Standard sought and obtained removal of the action to Federal District Court.[2] Standard then moved to

---

1. These companies succeeded to the interest of Dorothy Harris, an original party to the agreement.

2. The case was ultimately transferred to United States District Court for the District of Oregon, pursuant to the venue provisions of 28 U.S.C. § 1404(a).

dismiss the action, on the ground that Powell (a Washington resident) and the Harris Companies were indispensable parties. Perkins then amended his complaint to join Powell and the Harris Companies as defendants, after they refused to join with him as parties plaintiff.

Standard then moved to dismiss the action on the ground that diversity jurisdiction was lost, since Perkins and Powell were both citizens of Washington. The district court thereupon realigned Powell and the Harris Companies as parties plaintiff to preserve diversity jurisdiction, and denied the motion to dismiss, 29 F.R.D. 16. The cause was then tried to a jury, which rendered a substantial verdict in favor of Perkins.

■ Standard moved for judgment notwithstanding the verdict and for a new trial; after these motions were denied and judgment was entered Standard appealed. Thereafter Standard filed a motion in the district court for relief from judgment pursuant to Rule 60(b).[3] At the request of the district court, we remanded the case to permit that court to consider the latter motion. Thereafter, a hearing was held in the district court and the motion for relief was denied. Standard then filed an appeal from the latter ruling. This court ordered both appeals consolidated, for the purpose of briefing, argument and determination.[4]

### I.

■ We reject Standard's threshold contention that diversity jurisdiction was lacking. In substance, it is Standard's view that Powell is an indispensable party; that his interests are "adverse" to Perkins, requiring his alignment as a defendant; and that proper alignment would destroy diversity among the parties. These same arguments were presented to the district court, which realigned the parties upon an examination of their "real and true interests." Perkins v. Standard Oil Co. of California, 29 F.R.D. 16 (D.C.Or.1961).

Nothing before us demonstrates that Powell was asserting an interest in the claim; nor do we find that Powell's position was "adverse" to that of Perkins in the sense that required him to be made a party defendant. To say that Powell did not agree with Perkins that an action should have been brought, is not to say that he occupied the position of a defendant having an immediate stake in the suit. We believe the district court's realignment finds support in these cases. See Poole v. West Point Butter and Cheese Ass'n, 30 F. 513 (C.C.Neb. 1887) Appeal Dismissed, 140 U.S. 694, 11 S.Ct. 1026, 35 L.Ed. 600; Cf. Federal Mining and Smelting Co. v. Bunker Hill & Sullivan M. & C. Co., 187 F. 474 (D.C. Ida.1909); Henley v. Protective Life Ins. Co., 95 F.Supp. 988 (D.C.Miss.1951).

### II.

■■ We need pause only briefly to deal with Standard's contention that the jury erred in determining that the Yakima area was included as part of the marketing territory allotted to Perkins

3. The motion was based upon grounds of newly discovered evidence, fraud and misrepresentation of Perkins in offering of evidence—namely, three exhibits consisting of assignments of Perkins Oil Company to Perkins. It was Standard's contention that Perkins caused these instruments to be prepared and executed after the trial had commenced, in an attempt to remedy his lack of standing to maintain the suit.

4. Appellee's motion to dismiss the appeal is denied. Such an extreme measure would hardly be justified even if, as appellee urges, "appellant's Reply Brief is replete with misstatements of fact * * *" There are other less drastic and far more suitable measures available to protect courts and litigants if a party seeks to gain an unconscionable advantage through a deliberate attempt to mislead. We should, perhaps, hasten to add that appellant's brief does not warrant this criticism, nor does it reflect anything but a proper attempt by counsel to aid the court. If we were inclined to engage in a discussion of the briefs in this matter, many of our remarks might well be devoted to the brief filed by appellee.

and his co-consignees. The rule is long settled that it is "an undue invasion of the jury's historic function for an appellate court to weigh conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury." Cf. Lavender v. Kurn, 327 U.S. 645, 652–653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946). And here, the map appended to and made a part of the contract was convincing physical evidence from which the jury could rationally conclude that the Yakima area was indeed a territory allotted to the consignees. The jury was neither required to nor apparently did it believe Standard's assertion that the Yakima area had been included as part of the consignees' territory by mistake.

### III.

Two procedural issues are raised, the proper resolution of which, Standard contends, operate to bar this action. Neither, in our estimation, has compelling merit.

In the first, Standard argues that Perkins' failure to comply with a contractual provision requiring him to give Standard notice of any claim of breach precludes his action. The contract provides "In the event of any breach by Standard of any provision of this agreement, consignee shall give Standard written notice of any such breach and Standard shall have five days within which to comply with the provisions breached. If said breach is not corrected within said five-day period, consignee may, at its option, terminate this agreement by giving Standard 25 days' notice thereof in writing."

Nowhere in the agreement is notice made an express condition precedent to suit. And a court will not imply that a covenant is a condition unless it clearly appears the parties so intended

it, particularly when the limitation period provided by the contract is very short. It bears emphasis that we here deal with a so-called "adhesion" contract prepared by Standard.[5] Provisions in such contracts should be construed in accord with the understanding attached to them by laymen unversed in the law. We think that had Standard intended this particular provision to operate as a condition precedent to suit, it could have manifested such intention by language leaving far less to implication than did this.

Moreover, as Professor Merrill has stated in his text:

"The vast majority of decided cases accord to the pleadings filed in litigation an equivalence to the formal service of notification upon the opposite party. This is true not only of demands for the performance of duty owed where law and contract are silent, but also of that numerous class of cases in which statute or contract prescribed notification by the plaintiff to the defendant if he is to maintain suit. The common sense reasoning of the judges in these cases that the separate notification is a vain thing upon which the law ought not to insist and that the contracts prescribing notification in general terms are not commands of limitation but of information * * *" 2 Merrill on Notice § 763 at pp. 189–190 (1952).

In short, to accord the contractual provision the effect contended for by Standard would be neither warranted by the express language of the contract nor by sound considerations of policy.

So it is likewise with the contention that the 1956 agreement which "terminated and superseded" the agreement sued on would thus divest plaintiff's cause of action. Parties may of course

---

5. "Adhesion contract" is a handy shorthand descriptive of standard form printed contracts prepared by one party and submitted to the other on a "take it or leave it" basis. The law has recognized there is often no true equality of bargaining power in such contracts and has accommodated that reality in construing them. See Kessler, Contracts of Adhesion, 43 Columbia L.Rev. 629 (1943). The term "Contract of Adhesion" was introduced into legal nomenclature by Patterson, The Delivery of a Life Insurance Policy, 33 Harv.L.Rev. 198, 222 (1919).

contractually extinguish prior vested rights. Whether they have done so, however, is a question of intent. See Grider v. Turnbow, 162 Or. 622, 94 P.2d 285, 290–291 (1939).

 We are of the view that when rights are created not by the contract itself, but vest as an incident of its breach, it takes language more explicit than a general expression of intent to terminate and supersede the terms of the earlier contract to divest them. See 5A Corbin, Contracts § 1236 at pp. 534, 538–40 (1964). Reduced to its simplest terms, the contrary rule contended for would make a provision to "terminate and supersede" an implied release. And an implied release premised on general and equivocal language should not and will not be lightly inferred. We are not inclined to sanction what could become "traps for the unwary," particularly when, as here, an adhesion contract is involved. See generally, 45 Am.Jur., Release § 26 (1943).

### IV.

 The crucial question in the case involves the interworking of the so-called "going business" rule of damages with the effect of the parol evidence rule. Standard points out that unless plaintiff operated a going business there can be no valid evidence of damage because his loss is too speculative and not reasonably certain. See Buck v. Mueller, 221 Or. 271, 351 P.2d 61, 66–67 (1960); Putnam v. Lower, 236 F.2d 561, 571–572 (9th Cir. 1956). Standard acknowledges that there is an exception to this rule, where the plaintiff has been given an exclusive agency within a territory and the defendant has breached the agreement by permitting another to sell products within the same territory.[6] In that event, damages are reasonably ascertainable by sim-

ply measuring the profits made by the person supplanting the plaintiff. If, however, the agency is non-exclusive, Standard contends the going business rule applies in full vigor and all evidence of damage is excluded because of its speculative nature. Although Perkins would dispute a rigid application of this rule, particularly where, as he contends the situation here warrants, alternative means of showing damages with reasonable certainty exist, it seems fair to say that Perkins concedes Standard's premise but maintains his agency was in fact exclusive, thereby bringing him within the exception to the going business rule. Standard first denies the fact. Secondly it contends that the parol evidence rule operates to bar evidence of the fact.

 As to whether the Perkins agency was in fact exclusive, the jury's determination that it was must be sustained if supported by substantial evidence. Although the record shows that Perkins recognized that the strict letter of the contract permitted Standard to supply other jobbers in the territory, it also shows that Perkins vigorously objected when Standard did so. This tends to corroborate the testimony of Allen Perkins with regard to the limited meaning attached by Standard to the contract language. He testified that:

"Mr. Johnson defined to us the meaning of the word 'non-exclusive' in this manner. He said that 'It is Standard's policy to have only one jobber in a territory. And for all purposes, you would be the exclusive jobber.' However, if we put the word 'exclusive' in the contract instead of non-exclusive, it might be construed that Standard could not sell a Chevron station or a small station or any of their regular custom-

6. The Oregon court has said, in prescribing the "going business" rule, " * * * it is not a sufficient reason for disallowing damages claimed that they cannot be exactly calculated." Buck v. Mueller, supra, 351 P.2d at 67. A fair inference may thus be drawn that the going business rule should not be applied unless it is

clear that none of its exceptions apply Otherwise a plaintiff may in fact suffer damages but will be deprived of redress because of the difficulty of their proof. As the quoted language and the cases cited in support of it make clear, that is plainly not the policy of Oregon.

ers. And that was the reason that the word meant non-exclusive. This was the explanation they've always given us for that word, because we jealously wanted to be the exclusive distributors—jobbers. We didn't want them to bring ten other people in to compete with us. And this subject was brought up probably many times. Even though we heard the story before, we wanted to be sure that they repeated and continued to know what it meant."

This testimony was also corroborated, in a measure, by A. P. Johnson, former head of Standard's jobber department. When asked whether it was Standard's policy to "have a single jobber in a single area, with rare exceptions" he responded that "It was good business for us to keep them segregated as much as we possibly could." And a long time Standard employee, who had been a vice president in charge of marketing, E. J. McClanahan, testified that: "We wanted them to be able to handle their business without competing with another jobber that we were supplying. So, generally, we try to give them a field and let them work there without another jobber interfering with their operations." He did, however, say there were exceptions to this policy, but indicated there were relatively few instances where there was overlap between jobbers (about six out of 17–20). But it was never more than an implication, and one which the jury is presumed to have considered, that Perkins was such an exception.

It remains, however, to determine whether the parol evidence rule operates to exclude the evidence recited above. Standard strenuously contends that it does. Perkins, no less strenuously, contends that it does not and claims to fall within virtually every known exception to the parol evidence rule.

Examination of the consignment agreement reveals no facial ambiguity warranting resort to extrinsic evidence, for paragraph 3 clearly provides: "Con-

signee is authorized to sell products hereunder on a non-exclusive basis. * * * " The question then is whether courts are confined to the four corners of the instrument in ascertaining the existence of ambiguity or whether they may explore the surrounding facts and circumstances, including customs in the trade, to determine the parties' intent. The answer, as we shall see, is founded on the policy underlying modern day applications of the rule.

Although it is often said that an instrument unambiguous on its face permits of no extrinsic evidence, and dicta in at least one case [7] would preclude such evidence on the facts here, we believe this is an overstatement of the rule. Applied literally, the principle as stated would proscribe all evidence of latent ambiguity. The source of the error lies in the manner the principle is stated. For when the above principle is rendered in the converse—parol evidence is admissible to explain an ambiguous writing—evidence *dehors* the writing is permitted to show a latent ambiguity and the error is cured. See McCormick, Evidence § 219 (1954). As a practical matter, stated either way, the rule in cases not involving latent ambiguity makes no difference in application. Oregon law, of conceded applicability here, clearly permits extrinsic evidence where latent ambiguity is demonstrated. See Doherty v. Harris Pine Mills, 211 Or. 378, 315 P.2d 566, 574 (1957). See also, Close-Smith v. Conley, 230 F.Supp. 411, 418 (D.C. Or.1964). A careful statement of the principle that governs this case is contained in Kenney v. Los Feliz Investment Co., Ltd., 121 Cal.App. 378, 9 P.2d 225, 229 (1932) where the court declared:

"It is a settled rule that, when the language employed is fairly susceptible of either one of two constructions contended for without doing violence to its usual and ordinary import, an ambiguity arises where extrinsic evidence may be resorted to for the purpose of explain-

---

7. Rudd-Melikian, Inc. v. Merritt, 282 F.2d 924, 927 (9th Cir. 1960).

ing the intention of the parties
* * * "

Quoted with approval in Walsh v. Walsh, 18 Cal.2d 439, 116 P.2d 62, 65 (1941).

■ Considerations underlying the parol evidence rule are fully consistent with our view that extrinsic evidence is admissible in the circumstances disclosed. Wigmore tells us that the parol evidence rule had its genesis in the reluctance of early day judges to permit illiterate jurors to rely on oral testimony at variance with the writing of the contract itself. Accordingly, a rule of absolute exclusion subject to the control of the court, was formulated. See 9 Wigmore, Evidence § 2461 at p. 188 (1940). As the law developed, it became apparent that absolute certainty could not always be found in even seemingly clear language, and the consequence of over rigid application of the parol evidence rule was often to defeat the intentions of the parties. Therefore, a growing number of extrinsic facts and circumstances were admitted into evidence if the "open sesame" of ambiguity was first established. As long ago as 1890, Justice Bowen warned against making facial ambiguity a touchstone conditioning admissibility of extrinsic evidence. Alliteratively, he viewed the single plain meaning rule less as a "command of construction" than as a "counsel of caution." See In re Jodrell, 44 Ch.D. 590; 9 Wigmore, Evidence § 2462 at p. 193 (1940).

Today, mechanical application of the single plain meaning rule should be resisted; paramount consideration should be given the modern rationale and purpose of the parol evidence rule to provide reasonable stability to the meaning of words used by parties in their contracts. Ibid. This is but a variant of and wholly comports with the court's first duty of effectuating the parties' mutual intention. See Arbogast v. Pilot Rock Lumber Co., 215 Or. 579, 336 P.2d 329, 331, 72 A.L. R.2d 712 (1959). And here it seems clear that the parties' usage of the term "nonexclusive" was intended to have the meaning, "exclusive except for Standard." That is what the jury impliedly

found and what the evidence indicated. In short, the real issue here, and one that must be resolved against Standard, is not so much what a ritualistic interpretation of the contract language might indicate, but what the parties intended their contract to mean.

## V.

Over objection from Standard, the District Court admitted as evidence bearing on the issue of damages:

(1) Sales by True Oil Co., an independent Standard jobber in the Yakima territory, selling under the brand name "Rainbow";

(2) Profit margins established by Perkins' operations in other areas of Washington and Oregon, to demonstrate his competitive capacity.

■ Several considerations support the decision of the District Court to admit the evidence. "[I]t is to be borne in mind that the mere fact that damages may not be exactly calculated is not sufficient reason for disallowing them." Cross v. Harris, 230 Or. 398, 370 P.2d 703, 707–708 (1962). A necessary corollary is that there is " * * * no objection to placing before the jury all the facts and circumstances * * * having a tendency to show damages and their probable amounts so as to enable them to make the most intelligent and probable estimate that the nature of the case will permit." Turner v. Jackson, 139 Or. 539, 4 P.2d 925, 11 P.2d 1048, 1053 (1932). The reason for permitting such evidence rests on the fundamental proposition that no man may be permitted to profit from his own wrong. "Since defendant made it impossible for plaintiff to realize any profits, it cannot complain if the probable profits are of necessity estimated." National Soda Products Co. v. City of Los Angeles, 23 Cal.2d 193, 143 P.2d 12, 17 (1943). Professor Corbin states the consequence well:

"If the mind of the court is certain that profits would have been

made if there had been no breach by the defendant there will be a greater degree of liberality in allowing the jury to bring in a verdict for the plaintiff, even though the amount of profits prevented is scarcely subject to proof at all. In this respect, at least, doubts will generally be resolved in favor of the party who has certainly been injured and against the party committing the breach. The trial court has a large amount of discretion in determining whether to submit the question of profits to the jury; and when it is so submitted the jury will also have a large amount of discretion in determining the amount of its verdict."

5 Corbin, Contracts § 1022 at pp. 142–146 (1964). Thus, once a foundation of reasonable comparability was shown,[8] evidence of sales made by True Oil Co. and profit margins made by Perkins in his other operations were admissible at the sound discretion of the trial court. The effect of differences in circumstances, rather than absolutely conditioning admissibility, is a question more properly addressed to the jury under appropriate instructions. And the record shows that this court carefully admonished the jurors not to award damages based on speculation, and pointed out in some detail the purpose for which this evidence was admitted and how it should be considered.

### VI.

Standard also objects that Perkins' claim for expenses in connection with preparation for a move into the Yakima area was improperly submitted to the jury. Standard contends that it was not apprised of this claim, contrary to the mandate of Rule 9(g) F.R.Civ.P.

It is clear, however, the jury award was based on loss of profits, a theory totally incompatible with an award based on a claim for "out of pocket" expenses, such as the one disputed here. Moreover, the court clearly instructed the jury:

"Bear in mind, members of the jury, if you ultimately determine and fix plaintiff's damages, if any, on the lost profit basis or theory you will not consider nor allow for items of services or expenses incurred in preparation of going into the area prior to the date of the breach of defendant, except as being a part of actual expenses chargeable against future net total receipts, if any you find there would have been."

No prejudice could or did befall Standard. We do not, therefore, reach the question of whether this item of expense was improperly submitted to the jury.

### VII.

It is Standard's contention that the real party in interest in this case was Perkins Oil Company, a closely held corporation owned by Perkins, his son and his nephew. Standard argues that Perkins brought the suit as an individual and was not in fact an assignee of the Perkins Oil Company when this action was commenced. If, however, Perkins sued as an assignee of the corporation, he may of course recover on the corporate claim.

(a) To begin at the beginning, Standard sharply disputes the jury's factual determination that the claim had

---

8. We believe the distinguishing characteristics between the evidence presented by Perkins and what of necessity was the hypothetical situation of an operation by him in Yakima went only to the weight rather than to admissibility of the evidence. As has been well said, "There is no bright line that divides evidence worthy of consideration by a jury, although subject to heavy counter-attack, from evidence that is not. Especially because of the guaranty of the Seventh Amendment, a federal court must be exceedingly careful not to set the threshold to the jury room too high." Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912 (2d Cir. 1962). We have no reason to believe the Oregon courts would take a more limited view of the right to a jury trial on this issue.

been assigned to Perkins prior to suit.[9] Rather, it contends the evidence, consisting of the testimony of experts and at variance with the testimony of Perkins' lay witnesses, shows beyond dispute that written assignments were not made and signed until after suit was commenced. The argument is a very convincing one. But it comes too late. "The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury * * * The very essence of its function is to select from among conflicting inferences and conclusions that which is considered most reasonable * * * Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Cf. Sentilles v. Inter-Caribbean Corporation, 361 U.S. 107, 110, 80 S.Ct. 173, 176, 4 L.Ed.2d 142 (1959); Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944). Particularly is this true, when as here a disputed fact is made the subject of a special interrogatory. Thus, although Standard's cross-examination of Perkins' witnesses to the disputed transaction was telling and the credentials of Standard's experts were impressive, the determination must stand. That we might have reached a different conclusion is without significance; where the issue of authenticity is controverted and its resolution turns on the relative trustworthiness between eyewitnesses to the transaction and the reliability of scientific testimony, the jury holds full sway. Expert testimony, in common with all testimony, merely establishes probability, not certainty. Even great probability is not certainty. And it remains the exclusive function of the jury to assess the relative probabilities and establish the facts. Moreover, the jury is able to view the issue on which expert testimony is given within the context of the entire case and is free, within limits, to give it great or little significance however otherwise it might be regarded from a strictly legal point of view. Many regard this as the genius of the jury system.

(b) Whether Perkins' failure to plead or otherwise inform Standard of the assignment prior to trial will defeat his action must be answered by determining if Standard probably suffered prejudice because of a lack of notice. We do not perceive that any resulted, or could have resulted, here. In reality, the claims of the Perkins Corporation, a corporation almost solely owned by Perkins, were those of Perkins himself. In these circumstances, notice of the substantive claim is sufficient; the status of the party bringing it is immaterial. Cf. New York C. & H. R. R. Co. v. Kinney, 260 U.S. 340, 43 S.Ct. 122, 67 L.Ed. 294 (1922).

### VIII.

Standard specifies as prejudicial misconduct requiring a new trial six instances where counsel for Perkins, in the presence of the jury offered gratuitous observations that suggested Standard was a malevolent Goliath and Perkins a righteous David.

Such conduct is not to be condoned and certainly should not be rewarded. But to warrant a reversal, the flavor of misconduct must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict. In this trial, as protracted and complex as it was, we cannot attach enough significance to any of the matters or all of them collectively to conclude with any degree of assurance that the verdict was tainted.

### IX.

Standard next attacks an instruction given by the court on the issue of mistake. The instruction reads:

---

9. This issue was resolved by a jury sitting in a companion case between these parties, involving the authenticity of these same assignments, and provides the basis for Standard's motion for relief from judgment in this appeal.

" * * * You are instructed that even though you find from the evidence in this case that the territorial map attached to the 1953 Consignment Agreement, and the purchase and sale agreement included the Yakima area as a territory in which the defendant agreed to supply petroleum products to the plaintiff for distribution and sale, nevertheless, if you further find from a preponderance of all the evidence in the case that it was not *mutually understood by the parties that said territory was not to be included but was included on the territorial map as a result of a mistake on the part of the scrivener* or the person making or preparing the map on behalf of the defendant, then you are instructed that such mistake constitutes a defense to the claim and under such circumstances your verdict in this case would have to be for the defendant and against the plaintiff * * * " (We have italicized the criticized portion).

The error asserted is the double negative which, it is contended, was confusing and contradictory to the jury.

 While it is the judge's duty to adequately and clearly instruct the jury on the law of the case, counsel likewise shares some responsibility and his failure to make timely objection to an instruction, proposed or given and to " * * * distinctly [point out] the matter to which he objects and the grounds of his objection," precludes a party's appeal on that point, unless the error is plain and prejudicial. Rule 51, F.R.Civ.P. Here counsel for Standard did not make such an objection. And although the instruction is less than a model of clarity, prejudice is not apparent. Moreover, the court, in concluding its instructions, clarified the earlier statement saying "If you find from a pre-ponderance of all the evidence in the case that it was never mutually understood between the parties that Perkins should have the Yakima area, and that the inclusion of the Yakima area on the map was through inadvertence of the person who prepared it, then that would end plaintiff's claim for damages and your verdict would have to be for the defendant * * * "

## X.

 Standard's final point relates to their counterclaim against Perkins. It is based on Perkins' alleged failure to return or pay for consigned products in his possession at the termination of the 1956 contract. Examination of the record dealing with this aspect of the case reveals vagueness and uncertainty surrounding the claim. The issue was submitted to the jury, and its implied finding against Standard is fully supported by the evidence.

There being no reversible error, the judgment is affirmed.

DUNIWAY, Circuit Judge (concurring).

I concur in the decision of the Court and in all of the opinion of my brother Koelsch, except Part VII relating to the assignments from Perkins Oil Company to Perkins. In my opinion, it does not lie in the mouth of Standard to assert in this breach of contract case that Perkins Oil Company, rather than Perkins, is the real party in interest. The contract was between Standard and Perkins. By its own terms, it was not assignable without Standard's consent. No assignment was ever made by Perkins, nor would Standard consent to any such assignment. Standard dealt only with Perkins. Consequently, I think it immaterial whether the purported assignment is valid, and that we ought not to decide that question in this case.