444 F.2d 477
 1971 Trade Cases P 73,580
 EL SALTO, S.A., Escuintla, Guatemala, C.A., Plaintiff-Appellee,
v.
PSG CO., Defendant-Appellant.
EL SALTO, S.A., Escuintla, Guatemala, C.A., Plaintiff-Appellee,
v.
Philip S. GREENBERG, Defendant-Appellant.
EL SALTO, S.A., Escuintla, Guatemala, C.A., Plaintiff-Appellant,
v.
Philip S. GREENBERG, Defendant-Appellee.
 Nos. 23708, 23709, 23715.
 United States Court of Appeals, Ninth Circuit.
 May 12, 1971, As Modified on Denial of Rehearing June 16, 1971.
 
 Gerald J. O'Connor (argued), of Sullivan, Roche & Johnson, San Francisco, Cal., White, Sutherland & Gilbertson, Portland, Or., for appellants.
 Clifford N. Carlsen, Jr. (argued), of King, Miller, Anderson, Nash & Yerke, Portland, Or., Thurman Arnold and William D. Rogers, of Arnold & Porter, Washington, D.C., for appellee El Salto, S.A.
 Before HAMLEY and MERRILL, Circuit Judges, and THOMPSON, District judge.*
 MERRILL, Circuit Judge:
 
 
 1
 El Salto, S.A., a Guatemalan company engaged in the production, processing and marketing of raw and refined sugar and green coffee, instituted this action against PSG Co., and Oregon corporation, and Philip S. Greenberg, and Oregon citizen who is the president, general manager and sole stockholder of PSG, to recover the price of coffee shipments made to PSG, damages for breach of contract, and treble damages for PSG's alleged violations of 2(c) of the Robinson-Patman Act, 15 U.S.C. 13(c) (1964).
 
 
 2
 Beginning in 1963, El Salto entered into several contracts with Greenberg and PSG to effect the marketing of its coffee and sugar exports in the United States. Initially Greenberg dealt directly with El Salto. On August 1, 1963, Greenberg organized PSG; thereafter he conducted all his business with El-Salto through PSG.
 
 
 3
 On April 30, 1965, PSG and El Salto executed what was in form a sales contract that obligated PSG to purchase a minimum of 6,000 bags of El Salto's coffee from the 1965-1966 crop year. The agreement designated PSG as both the buyer and 'sole and exclusive agent' in the United States for El Salto and provided that El Salto would pay PSG a commission of 2 1/2 per cent of the sale price of the coffee sold under the contract.
 
 
 4
 On August 19, 1965, El Salto and PSG signed a new agreement that designated PSG as the exclusive sales agent for El Salto's coffee and sugar exports for the crop years 1965-1966 through 1968-1969. El Salto agreed to pay PSG a 2 1/2 per cent commission on sales, and guaranteed PSG a minimum annual commission of $25,000 per year for services rendered to El Salto.
 
 
 5
 PSG subsequently negotiated eight sales of El Salto coffee to American purchasers. When PSG declined to forward some $100,000 in receipts to El Salto, claiming that it was entitled to do so under the April 30th contract, El Salto instituted this suit in federal district court.
 
 
 6
 After the trial of El Salto's common law claim for the price of coffee shipments made to PSG, the jury entered special findings of fact that PSG had retained $105,286.61 on the coffee contracts; that Greenberg had unjustifiably retained $2,187.39 on one of the coffee sales; that the August 19th agreement superseded and nullified the April 30th agreement; that (contrary to contentions of PSG later discussed) there was no $300,000 advance made by PSG to El Salto prior to April 30, 1965; that PSG was estopped from claiming a right to withhold monies under the coffee contract because it had issued a check in partial payment of the sums allegedly withheld; that Greenberg breached the obligations he undertook as agent to El Salto under the April 30th contract; and that Greenberg should not be held personally liable for the debts of PSG Co. Accordingly, the District Court entered judgment for El Salto for damages and the amount of coffee sales receipts withheld by PSG and Greenberg.
 
 
 7
 On the basis of a pretrial stipulation of facts, the court ruled that PSG had violated 2(c) of the Robinson-Patman Act by claiming agency commissions under the August 19th contract. Treble damages were awarded to El Salto based on a stipulation that the amount of commissions was $5,058.71.
 
 I. Case No. 23,708
 
 8
 In this case PSG appeals from the District Court's award of treble damages for violation of the Robinson-Patman Act and from the imposition of contract liability.
 
 A. The Robinson-Patman Act Claim
 
 9
 Section 2(c) of the Robinson-Patman Act, 15 U.S.C. 13(c) (1964), prohibits parties to a sales contract from granting or receiving a 'commission, brokerage * * * or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods.'
 
 
 10
 We find no error in the District Court's determination of liability. On appeal, PSG contends that the District Court erroneously foreclosed argument on factual disputes surrounding the Robinson-Patman Act claim by ordering judgment before trial; that the agreed facts before the court at the time it ordered judgment fail to establish that PSG was a buyer or that commissions had actually been paid to PSG; and that the District Court's procedure improperly deprived PSG of a jury trial.
 
 
 11
 We do not agree. The District Court made findings of fact and entered judgment on the Robinson-Patman Act claim after the trial, not before. The court's pretrial ruling merely declared that, on the record at that time, there was a Robinson-Patman Act violation as a matter of law. The District Judge did not then limit the fact issues to be tried or in any way curtail defendant's proof. The agreed facts and the facts later adduced at trial adequately established that PSG acted as a buyer and that it received commissions from El Salto. We find no support in the record for PSG's contention that it attempted to reserve some factual issues for the jury. Rather, the record shows that PSG explicitly waived its right to jury trial on the Robinson-Patman Act claim.
 
 
 12
 Before the District Court, PSG contended that El Salto's Robinson-Patman Act claim was barred because El Salto was in pari delicto. Since PSG has abandoned this argument on appeal, we need not discuss it here. The record in this case fails to support PSG's argument that there was such a 'truly complete involvement and participation in a monopolistic scheme' by El Salto as would provide a basis for barring the Robinson-Patman Act claim apart from the idea of pari delicto. See Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 140, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).
 
 B. The Contract Claim
 
 13
 On appeal from the imposition of contract liability, PSG urges that the trial court erred in rejecting its claim that the April 30th contract afforded it a right to withhold coffee sales receipts and apply them against a '$300,000 advance' it allegedly had made to El Salto.
 
 The contract provides:
 
 14
 'Payment for coffee to apply against $300,000.00 advance made by PSG Co. to El Salto, S.A. until such advance, and interest due, has been liquidated. Balance of funds after liquidation of $300,000.00 advance, less commission and expenses, to be remitted to El Salto, S.A. upon completion of contract.'
 
 
 15
 El Salto contended that any advance made was fully liquidated. PSG contended otherwise. The court admitted oral testimony for the purposes of identifying the advance referred to by the agreement and establishing the facts of payment. The testimony presented by El Salto indicated that the reference to an advance was inserted in the contract only to facilitate a future Oregon bank loan to Greenberg, who on July 29, 1965, in turn loaned the money to El Salto's affiliate Orion Enterprises. It is not disputed that these loans had been liquidated long before PSG attempted to justify its retention of coffee monies on the basis of a purported right to set-off.
 
 
 16
 PSG, however, argues that the District Court erred in refusing to apply the stringent Oregon parol evidence rule, see, e.g., Kergil v. Central Oregon Fir, 213 Or. 186, 323 P.2d 947 (1957), to exclude the testimony admitted at trial to show that the April 30th agreement in fact referred to a future loan, since liquidated, that was made to El Salto's affiliate.
 
 
 17
 We disagree. On its face the contractual language in question simply provides for the manner in which sums due under the contract were to be applied. El Salto's ultimate factual contention would not vary the terms of the agreement in this respect: El Salto simply claimed (and the jury found) that no unliquidated advance remained against which payments were to be off-set.
 
 
 18
 PSG contends, in effect, that the language in question not only provides for the disposition of sums due but also constitutes an indisputable acknowledgement by El Salto of a then-existing indebtedness. But the contract is not so phrased and the language in question seems far too imprecise to accommodate such a construction. At the very least the contract is ambiguous in this respect and a jury question was presented as to whether the parties intended to acknowledge an existing debt.
 
 
 19
 Oregon law, of conceded applicability here, clearly permits extrinsic evidence where latent ambiguity is demonstrated. See, e.g., Doherty v. Harris Pine Mills, Inc., 211 Or. 378, 315 P.2d 566, 574 (1957). As we stated in Standard Oil Co. of California v. Perkins, 347 F.2d 379, 386 (9th Cir. 1965), 'paramount consideration should be given the modern rationale and purpose of the parol evidence rule to provide reasonable stability to the meaning of words used by the parties in their contracts. * * * This is but a variant of and wholly comports with the court's first duty of effectuating the parties' mutual intention. * * *'
 
 
 20
 Viewed in light of these considerations, we feel that the challenged testimony did not contradict the terms of the April 30th agreement. We find no error in the trial court's determination that PSG did not have a right to set off $300,000 against El Salto.
 
 
 21
 As a second defense to contract liability PSG contends that if the treble damage award entered against it was proper, then the District Court erred in permitting recovery on a contract that contained a violation of 2(c) of the Robinson-Patman Act.
 
 
 22
 We note that the circumstances in which an alleged antitrust violation may become a defense in a private contract action are narrowly circumscribed. In Bruce's Juices v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947), the Supreme Court held that a seller's action for the purchase price of goods sold would not be barred simply because he violated 2(a) of the Robinson-Patman Act by giving third persons a greater discount than he gave the buyer. The Court noted that the antitrust violations complained of were not inherent in the particular contract in suit, and that the plaintiff did not have to prove his violations of antitrust law in order to establish a right to recover under the contract. Id. at 755-756, 67 s.Ct. 1015, 91 L.Ed. 1219.
 
 
 23
 This case differs from Bruce's Juices, supra, in that the alleged antitrust violation is inherent in the very contract sued upon by El Salto. But we do not find this circumstance dispositive. The Supreme Court has ruled that a Sherman Act violation is not an affirmative defense to a contract suit, even where the violation is inherent in the contract sued upon, so long as judicial enforcement of the contract would not be enforcing the precise conduct made unlawful by the Act. Kelly v. Kosuga, 358 U.S. 516, 519-520, 79 S.Ct. 429, 3 L.Ed.2d 475(1958). See Lewis v. Seanor Coal Co., 382 F.2d 437, 441 (3d Cir. 1967). We think that PSG's Robinson-Patman Act defense to the contract action must be rejected under the same principle that was enunciated by the Court in Kelly v. Kosuga, supra, at 520-521, 79 S.Ct. at 432: 'Past the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act, the courts are to be guided by the goverriding general policy * * * 'of preventing people from getting other people's property for nothing when they purport to be buying it."[1] Neither the language nor the legislative history of 2(c) of the Robinson-Patman Act indicates that Congress intended to permit the avoidance of private contracts as a sanction. Moreover, since no part of the money sought by El Salto from PSG represents payments barred by the antitrust laws, there is an even stronger case for recovery here than in Bruce's Juices, supra, where part of the money sought by the seller represented an illegal differential in the price of goods. We conclude that PSG may not assert a violation of 2(c) of the Robinson-Patman Act as a defense to El Salto's common law contract action, since granting recovery to El Salto for the price of goods it actually sold to PSG would not promote an illegality forbidden by the antitrust laws.
 
 
 24
 In case No. 23,708, judgment is affirmed.
 
 II. Case No. 23,715
 
 25
 After a special jury finding that Greenberg was not personally liable for the debts of PSG, the District Court refused to 'pierce the corporate veil' of PSG Co. El Salto has appealed from this ruling. It advances two grounds this ruling. It advances two grounds and holding Greenberg personally liable.
 
 
 26
 First, El Salto argues that since it dealt with Greenberg personally and relied on him personally, and since it has sued Greenberg directly as well as in his derivative capacity, judgment should have been entered against Greenberg as an individual. We find this argument meritless. The trial court's instructions made it clear that the jury should find Greenberg individually liable for the obligations of PSG Co. if it found that El Salto contracted directly with Greenberg in his individual capacity.
 
 
 27
 El Salto's second argument is that the facts of this case establish that PSG was the alter ego of Greenberg and that Greenberg should therefore be held derivatively liable for the debts of PSG. El Salto asserts that Greenberg organized PSG solely for tax purposes; that he failed to keep separate sets of books for himself and the corporation; that he owned all of the corporation's stock and was its principal officer; that he personally participated in or ordered all the transactions complained of; and that refusal to hold Greenberg personally liable would promote injustice.
 
 
 28
 The circumstances of this case, however, do not in our view warrant a reversal of the District Court's determination that PSG was not the alter ego of Greenberg. In and of itself, the fact that Greenberg may have organized PSG to secure tax advantages is not significant in the determination of whether the corporate veil of PSG Co. should be pierced. See Schenley Distillers Corp. v. United States, 326 U.S. 432, 437, 66 S.Ct. 247, 90 L.Ed. 181 (1946). The mere fact that Greenberg was the sole stockholder of PSG does not by itself make him the alter ego of the corporation. See Bass v. Shutan,259 F.2d 561, 562 (9th Cir. 1958). While Greenberg kept no formal individual books of account separate from those of PSG, he prepared his individual income tax returns from original records and there was evidence to show that he had his own assets and liabilities and transacted his own affairs separately from PSG. Moreover, there is no allegation in this case that PSG Co. was an obviously undercapitalized corporation.[2] We do not feel compelled on this record to conclude that the District Court erred in determining that PSG Co. was not the alter ego of Greenberg.
 
 
 29
 In case No. 23,715, judgment is affirmed.
 
 III. Case No. 23,709
 
 30
 In this case defendant Greenberg asks reversal of the District Court's judgment taxing him $120 costs and attorney's fees for his failure to appear in response to El Salto's post-judgment attempt to take his deposition pursuant to Rule 69 of the Federal Rules of Civil Procedure.
 
 
 31
 After the District Court had entered judgment against PSG and had dismissed all claims against Greenberg personally, El Salto notified Greenberg that it wished to examine him as a judgment debtor. Greenberg refused to attend. On this appeal he contends that the District Court's judgment taxing him $120 costs and attorney's fees for his failure to appear was erroneous because he had not received a subpoena and because he could not be examined as a judgment debtor after the District Court had dismissed all claims against him personally.[3]
 
 
 32
 While Rule 69(a) permits a judgment creditor to examine 'any person,' mere notice to attend is insufficient to compel the attendance of a person not a party; a subpoena is required. See, e.g., Sunbeam Corp. v. Payless Drug Stores, 113 F.Supp. 31, 46 (N.D.Cal.1953); Fruit Growers Co-op v. California Pie & Baking Co., 3 F.R.D. 206 (E.D.N.Y.1942). Since Greenberg was not subpoenaed, and since he was not a party after El Salto's claims against him in his individual capacity had been dismissed, the notice sent to him was insufficient to compel his attendance as an individual.
 
 
 33
 We reject the argument that El Salto sought to examine PSG, the judgment debtor, through its sole corporate officer, Greenberg. The notice sent to Greenberg was not proper notice to an officer through whom the deposition of a corporation is sought, since it did not purport to seek Greenberg's deposition in his capacity of officer or managing agent of PSG. See Rule 30(a) of the Federal Rules of Civil Procedure (1966); Note, Discovery Against Corporations Under the Federal Rules, 47 Iowa L.Rev. 1006, 1014-16 (1962). Sanctions cannot be imposed on a corporation for the failure of its officer to appear when he was served with notice only in his individual capacity. See Gillam v. A. Shyman, Inc., 22 F.R.E. 475 (D.Alska 1958). See also Pioche Mines Consolidated, Inc. v. Dolman, Janney v. Dolman, 333 F.2d 257 (9th Cir. 1964). It would be anomalous to impose sanctions on Greenberg when it was the corporation's deposition that was sought and sanctions could not be imposed on the corporate party itself.
 
 
 34
 In case No. 23,709, judgment is reversed.
 
 
 35
 No costs are awarded.
 
 
 
 *
 Honorable Bruce R. Thompson, United States District Judge for the District of Nevada, sitting by designation
 
 
 [1]
 The Bruce's Juices Court's remark that the case law permitting a party to assert a Sherman Act violation as a defense to a contract suit 'does not fit the Robinson-Patman Act,' 330 U.S. at 756, 67 S.Ct. at 1021, 91 L.Ed. 1219, was not, we feel, intended to preclude the application in Robinson-Patman Act cases of all principles derived from Sherman Act cases
 
 
 [2]
 Compare Anderson v. Abbott, 321 U.S. 349, 362, 64 S.Ct. 531, 88 L.Ed. 793 (1944)
 
 
 [3]
 We reject Greenberg's contention that the notice to appear was improper under Rule 62(a) of the Federal Rules of Civil Procedure, which bars proceedings taken for the enforcement of a judgment until the expiration of 10 days after its entry. Judgment against PSG was entered on August 16, 1967. Although the notice sent to Greenberg on August 20th was invalid under Rule 62(a), Greenberg was given a new, valid notice dated August 28, 1967. We also reject Greenberg's suggestion that the attempted examination was barred by El Salto's failure to comply with Oregon state procedural rules. A judgment creditor proceeding under Rule 69(a) may utilize either state practice or the Federal Rules for taking depositions. See Burak v. Scott, 29 F.Supp. 775, 776 (D.D.C.1939); 7 Moore's Federal Practice, par. 69.06, p. 2421 (1970)