**W. C. JAMES, INC., Plaintiff,**

v.

**PHILLIPS PETROLEUM COMPANY, a Delaware corporation, Defendant.**

**Civ. A. No. C–3069.**

United States District Court, D. Colorado.

Aug. 29, 1972.

Clarke and Waggener, by David J. Clarke, Denver, Colo., for plaintiff.

Gorsuch, Kirgis, Campbell, Walker & Grover, by John J. Mullins, Jr., Denver, Colo., and C. B. McDonald, Jr., Bartlesville, Okl., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

WINNER, District Judge.

Plaintiff, a pipeline contractor, is a Nevada corporation with principal offices in Utah. Defendant, a petroleum producer and marketer, is a Delaware corporation with principal offices in Oklahoma. Diversity jurisdiction exists.

■ On June 23, 1970, the parties entered into a written contract by which plaintiff agreed to construct a 205,452 foot gas gathering pipeline system for defendant in the Highlight Field in Campbell County, Wyoming. The contract was awarded on bids which were submitted under a somewhat complicated pricing formula, and plaintiff's bid was $215,007, with the next three low bids being $219,396, $219,472 and $224,435.[1] The contract required a 60-day completion, and, following oral agreement entered into in late June or early July, 1970, another 92,400 feet of line were added by supplemental agreement dated July 31, 1970. Time for completion was not extended by the written supplement, but at trial the parties were in substantial agreement that the completion date was extended another 30 days.

We do not here have a case in which Phillips is complaining about the con-

---

1. The closeness of the bids eliminates any duty which may exist on the part of an owner to call attention to a patent mis-take. See, annotation 52 A.L.R.2d 792, 801.

tractor's failure to complete the work on time, but, rather, we have alternative claims by the contractor against Phillips, and these alternative claims are phrased in the stipulated pretrial order as follows:

"*First Claim*: That defendant breached its contract by (1) requiring plaintiff to perform more work in installing more complex meter runs than the contract drawings required, (2) requiring plaintiff to move each of plaintiff's crews a disproportionately greater number of times than the contract specifically required or reasonably implied, (3) failing to provide rights of way as required by the contract and in advance of the time that plaintiff was ready to work thereon, (4) failing to permit plaintiff to exercise complete and authoritative control over the work and the details and means of doing the work, and (5) failing to deliver pipe and other materials to the job site or to Douglas, Wyoming, in the correct sizes, in sufficient quantities, or at such times as were impliedly promised by Defendant as a necessary incident to the contract, or were reasonable, or were repeatedly promised by defendant's employees.

"Said breaches were either willful or constituted active interference with Plaintiff's work under the contract. As a proximate result of the breaches, (1) plaintiff was required to perform a great amount of additional work at greatly increased costs to install meter runs, (2) each of plaintiff's crews was required to travel from one meter setting to another, to move the equipment with which the work was being performed, and to spend many hours of non-productive time in connection with each move, (3) plaintiff was unable to perform any right of way work for approximately 75 days, was unable to perform the pipe welding phase of the work for approximately 32 days, was required to work in inclement weather at greatly increased costs which otherwise would have been avoided, was required to incur additional expenses in connection with the employment and use of the stringing, bending, pipe laying, tape and tie-in, backfill and clean-up and air test crews, was required to incur additional expense for the rental of equipment, for job supervision, and for additional overhead for nine additional weeks, and (4) plaintiff was unable to plan and perform the work in an efficient and economical manner with the result that plaintiff's costs and expenses were substantially increased throughout the period of construction. As a proximate result of the aforesaid breaches, plaintiff has suffered three types and amounts of damages: (1) direct on the job losses were $295,875.43, (2) loss of anticipated profits on the job were $65,000.00, and (3) damage to its credit and reputation and loss of its business were $400,000.00.

"*Second Claim*: Plaintiff claims that Contract PP–8402 is against public policy because Plaintiff had no reasonable choice, because of the gross superiority of defendant's bargaining power, but to adhere to unreasonable one-sided standard form terms which were unilaterally prepared by defendant. Said contract was a contract of adhesion in that it contained, in many pages of fine print, in paragraphs 2, 3, 3(d), 4, 4(a), 4(b), 4(c), 5, 6(c), 6(d), 7, 10, 10(a), 18, 19, 22, and 31 among others, provisions which were deceptive or unfair to plaintiff or one-sided in defendant's favor. Said contract had for its object, directly or indirectly, to exempt defendant from liability for its own willful injury to plaintiff's property and its own defaults and actions which interfered with the performance of the work by plaintiff or contributed substantially to plaintiff's costs and expenses in performing the work. Said contract was therefore unlawful, void, against public policy, and unenforceable, entitling plaintiff to recover, on a quantum meruit basis, for material, machin-

ery, equipment and labor used, done and performed by plaintiff.

"Plaintiff alleges the reasonable value of all material, machinery, equipment and labor was $760,000.00; that defendant has paid plaintiff $404,124.57, leaving a balance due of $360,875.43. In addition, plaintiff asserts damage to its credit and reputation and loss of its business were $400,000.00."

Defendant, of course, denies liability, and it says that plaintiff was paid in full under an enforceable contract. Additionally, defendant says that all claims for extras and all disputes were settled by mutual agreement prior to the filing of this case and that there was an accord and satisfaction.

The preliminaries to the basic contract were these:

Under date of May 11, 1970, Phillips invited plaintiff to bid on the job. The invitation letter advised bidders of the names, addresses and telephone numbers of Phillips representatives to contact if the bidders had any questions concerning the proposed work or concerning the bid documents. The bid instructions said, "Bidders shall inspect the site of the work and obtain a sufficient knowledge of existing conditions as affect this work;" and the contract said, " . . . Contractor shall assume entire responsibility for examination of the site of the work and for acquaintance with conditions that may exist or develop during the term of the contract." A form of the contract was included in the bid pack as were a set of the engineering standards to be followed. Although some other bidders visited the site, plaintiff, who had done work in the area before, believed that it was not necessary to inspect the site, and he did not do so, although he did fly over it. Nor did he contact any of the named Phillips' representatives to ask about the work which would be required under the proposed contract, although he did discuss the job with Phillips' representatives before the contract was signed.

During that discussion he indicated that he planned to lay 8,000 ft. of pipe per day, but he did not say that his bid was conditioned on his ability to do so.

In preparing his bid, James relied on his past experience and on a "typical drawing" of a meter installation which was only partially dimensioned and which showed on its face that it was not drawn to scale. Had James made an adequate inspection of the site, the length of the meter runs and most of the problems he later encountered could have been ascertained by him from visual inspection and from inquiry in the area in advance of the bid. The witness Pratt, who has years of experience in the construction of gas gathering pipeline systems, testified that if a contractor is to survive, it is essential in bidding such a job to make a thorough inspection of its physical aspects before submitting a bid, and the Court finds that James should have made such an inspection and that by failing to do so, he took his chances as to unexpected site conditions he might encounter. Phillips most assuredly did not mislead him as to those conditions, and James elected not to inspect the site.

The bid calculations made by James were somewhat sketchy, and they do not disclose any detailed calculations of meter runs, nor do they show that he relied on the unscaled, undimensioned "typical drawing" which at time of trial he said was so vitally misleading. Even if he did rely on it, his reliance on his application of an assumed scale to a drawing marked "no scale" does not evidence much care in the bid preparation. All in all, James' bid preparation can be fairly compared to a building contractor who submits a bid on a per square foot average cost of a typical building without taking time to make a cost and material breakdown from the actual plans and without checking the site. Bids so prepared are quick and easy, but they have inherent risks which are assumed by the contractor in exchange for time saving in his bid preparation.

The contract required Phillips to furnish the required materials, and it provided:

"If contractor is obstructed or delayed in the prosecution of completion of the work for any of the following reasons:

"(a) Neglect, delay, or fault of any other contractor having a contract with Company for adjoining or contiguous work, or,

(b) The unusual action of the elements, or,

(c) The abandonment of the work by Contractor's employees in a general strike, or,

(d) Any delay on the part of the company in furnishing materials or sites for the work;

"in any of such events, contractor shall have no claim for damages for any such cause or delay. However, contractor shall be entitled to an extension of time for the completion of the work such as company may approve as being just and proper; provided, however, that such claim in duplicate for extension of time is made by contractor in writing within one (1) week from the time any cause for delay occurs."

■ Plaintiff says that the contract is not enforceable because it gives Phillips carte blanche to fix times of extension, but there is an implied requirement that Phillips would have to be reasonable in its allowance of time extensions. However, as we have noted, Phillips is here making no claim for delay in completing the job, and plaintiff falls back on the argument that the provision saying that Phillips can't be held liable in damages for failure to furnish materials or right of way is of no effect. If, as plaintiff charges, Phillips was negligent in obtaining materials or right of way, or if it had willfully failed and refused to obtain them, we would have a different case, but Phillips was neither negligent nor willful in failing to provide materials or right of way for plaintiff to work with or on. In fact, lack of available right of way and materials as needed during the job's progress was minimal, and Phillips made a good faith effort to make right of way and materials available to James as he needed them.

Exhibit O which formed the backdrop for so much of the testimony in the case shows a nonproductive period during the job, but the lack of right of way acquisition shown between about July 13, 1970, and September 18, 1970, didn't seriously interfere with progress of the job. For the most part, the unacquired right of way was for the work required by the contract supplement of July 31, 1970, and the delay in pipe laying resulted in large part from plaintiff's request (approved by Phillips) to move his crew to another job. Delays in jobs such as this are inevitable as plaintiff well knew because his public accountant testified that on an earlier job James had with Phillips, he encountered delays in right of way acquisition. (Phillips and James settled the right of way shortage on the earlier job for $5,000.00). Most importantly, the ditching line on Exhibit O (and ditching was the first critical step in plaintiff's work) doesn't indicate a substantial need for more right of way until about August 22, 1970, yet James' public accountant testified that by that date he had already ascertained that James had taken on an extremely unprofitable job, and that in the latter part of August, he urged James to throw in the sponge. Thus, before any of the shortages about which plaintiff complains had any real impact on the job, he was losing money hand over fist. Moreover, by that date, James had moved his crew to his other job, and this didn't exactly speed up work under the Phillips contract.

■ James says that on the first contract 16 "spread moves" were reasonably required and that on the supplement 11 "spread moves" were reasonably necessary, but that because of the lack of materials and right of way, he had to make 14 additional moves, and that these cost him $900 apiece. [He actually made 60

moves, but he acknowledges that 41 were all which were reasonably required.] With reference to this claim, we simply refer back to that which we have already said about the furnishing of materials and right of way by Phillips, and the contract gives plaintiff a right to a time extension for any delays caused by unavailability of right of way or materials, but it waives claims for damages. Moreover, there was no proof that the moves stemmed from Phillips' fault. We say once more that had the delays or failure to furnish materials been of much greater magnitude or had they been willful or negligent, or had they caused significantly more moves (and we find that the necessity for the moves meet none of these tests), plaintiff might have a claim. The moves were made, but they were a normal risk of the job and they did not result from Phillips' fault. Moreover, not only did James fail to file any written claims of any sort with Phillips until the job was finished, he made no oral claims when he now says he was held up by material and right of way shortages. James' claim for additional "spread moves" must be denied.

■ Adequate site inspection and inquiry at the site would have put James on notice of the meter run problems. His reliance on the undimensioned and unscaled drawing was misplaced. He is chargeable with a duty to obtain pre-contract knowledge of the problems. And, after the job was over, Phillips agreed to some additional payments for part of the difficult meter runs and for other claims made by James. Those payments have been made and accepted. For these reasons. James has no valid claim for additional meter runs.

■ There was no showing that Phillips took over control of the job. The relationship between Fenn, James' top hand on the job, and Mitani, who was Phillips' supervisor during most of the work, was remarkably cordial. Mitani and other Phillips employees helped Fenn, but they surely did not assume

command. Within the sphere of his authority, Fenn called the shots, and, within the sphere of their authority, Phillips' representatives called their shots. Undeniably, the inspectors, after X-ray examination, rejected some of the welds, and, undeniably, as the job progressed, the rejection rate increased. The inspectors had changed, and a judgment factor entered into each inspection. Moreover, there was evidence that the quality of the welders' work deteriorated as the job went along. There was no showing of bad faith rejection of any welds, and Phillips' inspectors had the right to exercise a good faith judgment on the quality of the welding. They did so.

Phillips did not breach its contract with James, and it is to be enforced as written unless James can prevail on his second claim.

■ Accordingly, we come to James' second claim that this is a contract of adhesion. Standard Oil Company of California v. Perkins (9 Cir., 1965) 347 F.2d 379, says:

" 'Adhesion contract' is a handy shorthand descriptive of standard form printed contracts prepared by one party and submitted to the other on a 'take it or leave it' basis. The law has recognized there is often no true equality of bargaining power in such contracts and has accommodated that reality in construing them. . . . Provisions in such contracts should be construed in accord with the understanding attached to them by laymen unversed in the law."

Coincidentally, the United States Supreme Court has twice discussed adhesion contracts this year. D. H. Overmyer Co. v. Frick Co. (1972) 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124, came before the Court as an attack on the constitutionality of a cognovit provision in a note. The note was given in connection with a construction subcontract. A full recitation of the factual background appears in the Court's opinion, and the Court concluded that the

waiver of the right of notice of suit and the right to be heard was knowingly made. The fact that Overmyer was a fairly large corporation was considered significant as was the fact that Overmyer understood the consequences which might flow from its signature on the cognovit note. The Court denied the constitutional attack and upheld the judgment which rested on the cognovit note. The opinion concluded:

"Our holding, of course, is not controlling precedent for other facts of other cases. For example, where the contract is one of adhesion, where there is great disparity in bargaining power, and where the debtor receives nothing for the cognovit provision, other legal consequences may ensue."

Less than four months after the decision in Overmyer, Fuentes v. Shevin. (1972) 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 was decided. There, prejudgment, ex parte replevin statutes were considered. Household goods had been purchased from a large corporate seller, and the conditional sales contracts used gave the right of ex parte repossession as did the state replevin statutes. The Court struck down the state replevin statutes, and held that the purchase agreements were adhesion contracts and the waivers therein contained were ineffective. *Fuentes* says:

"Finally, we must consider the contention that the appellants who signed conditional sales contracts thereby waived their basic procedural due process rights. The contract signed by Mrs. Fuentes provided that 'in the event of default of any payment or payments, seller at its option may take back the merchandise. . . .' The contracts signed by the Pennsylvania appellants similarly provided that the seller 'may retake' or 'repossess' the merchandise in the event of a 'default in any payment.' These terms were parts of printed form contracts, appearing in relatively small type and unaccompanied by any explanations clarifying their meaning.

"In *D. H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, [92 S.Ct. 775, 31 L.Ed. 2d 124,] the Court recently outlined the considerations relevant to determination of a contractual waiver of due process rights. Applying the standards governing waiver of constitutional rights in a criminal proceeding —although not holding that such standards must necessarily apply—the Court held that, on the particular facts of that case, the contractual waiver of due process rights was 'voluntarily, intelligently and knowingly' made. Id., at 187 [, 92 S.Ct. at 775]. The contract in *Overmyer* was negotiated between two corporations; the waiver provision was specifically bargained for and drafted by their lawyers in the process of these negotiations. As the Court noted, it was 'not a case of unequal bargaining power or overreaching. The Overymyer-Frick agreement, from the start, was not a contract of adhesion.' Id., at 186 [, 92 S.Ct. at 783]. Both parties were 'aware of the significance' of the waiver provision. *Ibid.*

"The facts of the present cases are a far cry from those of *Overmyer.* There was no bargaining over contractual terms between the parties who, in any event, were far from equal in bargaining power. The purported waiver provision was a printed part of a form sales contract and a necessary condition of the sale. The appellees made no showing whatever that the appellants were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights.

"The Court in *Overmyer* observed that 'where the contract is one of adhesion, where there is great disparity in bargaining power, and where the debtor receives nothing for the [waiver] provision, other legal consequences may ensue.' Id., at 188 [,92 S.Ct. at 783]. Yet, as in *Overmyer*, there is no need in the present cases to canvass those consequences fully. For a

waiver of constitutional rights in any context must, at the very least, be clear. The contractual language relied upon must, on its face, amount to a waiver.

"The conditional sales contracts here simply provided that upon a default the seller 'may take back,' 'may re-take' or 'may repossess' merchandise. The contracts included nothing about the waiver of a prior hearing. They did not indicate *how* or *through what process*—a final judgment, self-help, prejudgment replevin with a prior hearing, or prejudgment replevin without a prior hearing—the seller could take back the goods. Rather, the purported waiver provisions here are no more than a statement of the seller's right to repossession upon occurrence of certain events. The appellees do not suggest that these provisions waived the appellants' right to a full post-seizure hearing to determine whether those events had, in fact, occurred and to consider any other available defenses. By the same token, the language of the purported waiver provisions did not waive the appellants' constitutional right to a preseizure hearing of some kind." [Emphasis by the Court]

In passing upon the claim here made that the Phillips' contract is one of adhesion, it is necessary to review some of the facts made important by *Overmyer* and *Fuentes*. James had done work for Phillips before under quite similar if not identical contracts. He had read and understood the contracts before, although he probably did not re-read the contract before he signed the one under present attack. Manifestly, Phillips is a much larger corporation than is James, Inc., but James, Inc., when the volume of its companion corporation Intermountain is added in, is hardly comparable to Mrs. Fuentes who bought a gas stove on time from Firestone Tire and Rubber Company. James' and Intermountain's combined volumes for fiscal 1967 through fiscal 1971, and for the first seven months of fiscal 1972 were:

| | |
|---|---|
| 1967 | $ 317,000.00 |
| 1968 | 2,595,500.00 |
| 1969 | 896,000.00 |
| 1970 | 1,447,000.00 |
| 1971 | 1,658,000.00 |
| 1972 | 542,000.00 |

During that same period, the two had lost as much as $406,000 in one year and had made as much as $199,000 in the first seven months of 1972. James, Inc. was an experienced and perhaps not untypical contractor engaged in a risky business. No changes in the general conditions of the contract were requested by James, although Phillips has agreed to changes requested by other contractors. There was indeed disparity in financial worth between the contracting parties, but the compulsion on James to sign the contract on any terms proposed by Phillips was not established, and, it is noteworthy that in preparing his bid, James added 20% for profit although he usually bids jobs with a 15% profit margin. It is true that James agreed to waive damage claims in event of delay in the furnishing of materials or right of way, but Phillips impliedly agreed to grant reasonable time extensions. We have pointed out that if delays were the result of Phillips' conscious wrong or negligence, in the words of *Overmyer*, other legal consequences might ensue. But it is not unusual for a contractor to accept risk of loss due to delays occasioned by normal business interruptions. Typically, contractors waive damage claims for delays due to weather, strikes, etc., and typically contracts provide that in event of such delays, a reasonable extension of time will be granted but damages cannot be claimed. The agreement here requires an extension of time when material or right of way shortages occur, and, although Phillips reserves the right to determine the length of time extension, were the length of the extension in issue, we would have no hesitancy in holding that a reasonable extension would have to be granted if material or right of way shortages were the cause of the

delays, and we would hold that no right to act arbitrarily was contracted for by Phillips.

On balance, this case falls under the principles of *Overmyer*, and James' waiver of a right to claim damages because of the material and right of way shortages was "voluntarily, intelligently and knowingly made." The contract is not overreaching; it is not a contract of adhesion. As has been said, it is enforceable according to its terms, and we have already found that Phillips has not breached it.

 Having so held, it is not necessary to this opinion to consider but we do consider Phillips' claim of accord and satisfaction. As the job neared its end, Mitani, the employee in charge of the job for Phillips, was being transferred to Norway. In accordance with prior oral agreement between James and Phillips, Mitani met with Fenn to work out all claims for extras on the job and to settle all disputes. There was disagreement in the testimony as to whether the parties intended to settle all claims and disputes, but the Court finds that such was the intent. During the Mitani-Fenn meeting, with give and take on both sides, all then outstanding extras and disputes (including settlements made on several of the categories of claims now made by James) were amicably settled between Fenn and Mitani, and Phillips made additional payments (which James accepted) on the basis of the agreements reached. After Mitani left for Norway, there was still some work to do on the job, and a second meeting was held between Fenn and Edwards, then acting in Mitani's stead as Phillips' representative. Once more there was give and take in the discussions and all disputes were settled, payment was made, and payment was accepted. There was an accord and satisfaction of all disputes existing at the job's end, and James cannot now renegotiate a contract on which he undeniably lost a lot of money, but, still, a contract which he, an experienced pipeline contractor, signed under no compulsion.

In its last analysis, the case is one in which James made a bad deal, and he now says that since Phillips is richer than he is, Phillips should pick up the tab. This just isn't the law, and, if it were, it would mean that a major corporation could do business only with other major corporations. Compared with Phillips, James, Inc. is a small outfit, but he doesn't stand in Mrs. Fuentes' shoes.

In summary, we find and conclude that Phillips did not breach its contract with James; that although the contract has some tough provisions in it from the contractor's standpoint, it is typical of contracts used in the construction industry, and taking into account all of the facts of the case, it is not a contract of adhesion. It is enforceable as it is written. Additionally, all disputes under the contract were settled in arm's length negotiations between authorized representatives of the parties, and there was an accord and satisfaction.

Judgment shall enter in defendant's favor and defendant is awarded its costs.